UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOV CHOTEAU<br><br>              Plaintiff,<br><br>    vs.<br><br>CITY OF NEW YORK, NYPD MEMBER RANDY DELGADO, individually and in his official capacity, NYPD MEMBER JOHN DOES 1-5, individually and in their official capacity.<br><br>              Defendants. | Civil Case No.<br><br>**COMPLAINT**<br><br>**DEMANDS A TRIAL BY JURY** |

Plaintiff, GEOV CHOTEAU by and through his attorneys, Cohen & Green PLLC and The Aboushi Law Firm, PLLC, and GIDEON ORION OLIVER, alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

2.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as a substantial part of the events and/or omissions described herein were committed in this district

4.     Plaintiff asserts the following claims pursuant to the United States Constitution, New York Constitution, Section 42 U.S.C.§ 1983, New York State law, as well as common law.

5.     Plaintiff has complied with all requirements for asserting his claims, including filing a notice of claim, thirty days having elapsed since presentation of the claim, and compliance with GML Section 50 and the relevant subsections.

1

## JURY DEMAND

6.      Plaintiffs demand a trial by jury in this action.

## PARTIES

7.      Plaintiff is a resident of Kings County, New York.

8.      Defendant Officer RANDY DELGADO, Shield No. 12464 is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his individual and official capacities.

9.      At all times herein, Defendant City of New York was and is a municipal entity created pursuant to the laws of the State of New York. Defendant City of New York operates and maintains the New York City Police Department ("NYPD"). The NYPD is an agency, arm and extension of the City of New York. Defendant City of New York and NYPD are the employers of the Defendant Officers and liable for their conduct.

10.     At all relevant times the Defendant Officers were acting under color of State Law, including acting as police officers for the City of New York. Defendants were acting within the scope of their employment as police officers and agents for the City of New York when they engaged in the conduct described herein.

11.     Officer Delgado and individuals John Does 1-5, are named individually and in their official capacity as Officials and/or Police Officers (hereinafter "Defendant Officers" or "Officer(s)") and were at all relevant times acting under the color of state law as Police Officers. These officers engaged in conduct that violated the Plaintiff's rights, but whose identities are not

2

yet known. This included using excessive force against Plaintiff and violating Plaintiff's rights to lawful assembly.

**STATEMENT OF FACTS**

12.    On September 26, 2024 at or around 6:00pm, Mr. Chouteau was attending a protest in support of Palestine on Park Avenue and East 62nd Street in Manhattan.

13.    As Mr. Chouteau protested on the sidewalk, members of the NYPD including Defendant Delgado rushed Mr. Chouteau and other protestors, pushing them into the street.

14.    Defendant Delgado and Defendant Officers Doe 1-5 used their batons to push protestors including Mr. Chouteau into the street.

15.    At the same time, dozens of protesters were lined up behind Mr. Chouteau, and Mr. Chouteau was unable to move back.

16.    Mr. Chouteau repeatedly told Defendant Officers s that he was unable to move back.

17.    Defendant Delgado, using both his hands and the force of his body, shoved his baton repeatedly into Mr. Chouteau's body, causing Mr. Chouteau to fall to the ground and to experience severe pain and the inability to move his hand.

18.    Realizing that his hand might be broken, Mr. Chouteau left the protest and went to a nearby emergency room.

19.    At the emergency room, Mr. Chouteau's right fingers were swollen and painful. He was unable to fully close or extend his fingers.

20.    Mr. Chouteau was ultimately diagnosed with a fracture of his right ring finger.

21.    Mr. Chouteau is an artist and small business owner who makes ceramics, sculptures, comics, and other art.

22.    As a result of Defendant Officers' assault of Mr. Chouteau, he did not have full function of his right hand for several months, and his ability to work was severely limited.

23.    The assault on Plaintiff was excessive, unjustified and unwarranted.

24.    Plaintiff did not do anything to warrant Defendant Officers' actions.

25.    Defendant Delgado has at least two complaints and 16 allegations against him, some of which include the use of force and abuse of authority. At least one of the allegations for the use of excessive force was substantiated, and a penalty against Officer Delgado is pending.

## THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

26.    Defendants used types and levels of force that were excessive and unnecessary force against Mr. Chouteau.

27.    The uses of force against Mr. Chouteau were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

28.    However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

29.    In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG- NYPD")[1], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

---

[1] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).

       a.    NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

       b.    NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

       c.    NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

       d.    NYPD training does not adequately focus on de-escalation; and

       e.    In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

30.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents." *See* OIG- NYPD Report at p. 2 *et seq*.; *see also* NYPD Patrol Guide Section 221-01[2] ("Force Guidelines") and 221-02[3] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

31.    Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs,

---

[2] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at
http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.
[3] Available online via the New York City Civilian Complaint Review Board website at
http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.

impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[4]

32.    Upon information and belief, Defendant Officers failed to document, and/or require that fellow Defendant Officers and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

33.    Defendant Officers used force that they knew, or should have known, would negatively impact Mr. Chouteau, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

**THE NYPD'S VIOLENT RESPONSE TO PROTESTS FOR BLACK LIVES IN 2020**

34.    Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

35.    For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned, and enforced by Defendant City and policymaking officials.

---

[4] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

36.     On June 17, June 18, and June 22, 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[5]

37.     The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protests. [6]

38.     The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[7]

39.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [8]

40.     Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research,[9] a 99-page report providing a detailed account of the NYPD's response to the June 4 peaceful protest in Mott Haven—a low-income neighborhood

---

[5] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[6] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

[7] *Id*. at 35.

[8] *Id*. at 56.

[9] US: New York Police Planned Assault on Bronx Protesters - *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System. See* https://www.hrw.org/video-photos/video/2020/09/30/us-new-york-police-planned-assault-bronx-protesters-animation

populated mostly by minorities, that has experienced high levels of police brutality and ingrained systemic racism.[10]

41.     On June 4, 2020, thousands of police officers surrounded and trapped protesters in Mott Haven, employing a tactic known as "kettling." Officers then beat kettled protestors with their batons and used pepper spray on them before arresting over 250 peaceful protestors.

42.     Further reports and videos taken at that protest event show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

43.     The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[11]

44.     Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

45.     *The People of the State of New York v. City of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[12]

---

[10] "Kettling" Protestors in the Bronx – *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf
[11] *US: New York Police Planned Assault on Bronx Protesters***,** HUMAN RIGHTS WATCH (2020), available at https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters.
[12] Stipulated Order, *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924, ECF No. 1099-2.

8

46.     Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021, the NYPD has continued to engage in actions related to policing demonstrations such as the ones described herein, violating Plaintiff's constitutional and other rights.

### THE NYPD'S FAILURE TO TRAIN REGARDING POLICING PROTESTS

47.     Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

48.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

49.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

50.     Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

51.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro- active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

52.     Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

53.     These disperse and demoralize tactics and trainings have persisted through the present.

54.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

55.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

56.     On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

57.     Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia*, the following:

   a.   The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

b.   The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

c.   The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

d.   The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead training focused almost exclusively on tactics designed to "disperse and demoralize" protesters; and

e.   The failure to ensure police response to protests and other protected activities are not based on the content thereof.

f.   The failure to ensure police response to protests and other protected activities are not based on the appearance, nationality or culture of protestors.

58.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and undisciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

59.    The SRG was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

60.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

61.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[13]

62.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and in pro-Palestine protests around the city, such as the ones described herein.[14] [15]

63.    Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[16]

64.    SRG members are meant to have additional DCU training.

65.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

---

[13] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns,* Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine- guns.

[14] Council on American-Islamic Relations, *CAIR-NY Calls on New York City Council to Disband the NYPD SRG, Invest in Community Programs Instead*, Mar 21, 2024, available at https://www.cair-ny.org/news/2024/3/21/cair-ny-calls-on-new-york-city-council-to-disband-the-nypd-srg-invest-in- community-programs-instead (reporting that from January 2024 to March 2024, the SRG been deployed to 205 peaceful protests since January, most of which were pro-Palestine protests).

[15] The New York Civil Liberties Unit, ACLU of New York, NYCLU on NYPD Violence at Pro-Palestine Protest in Bay Ridge, May 19, 2024, available at https://www.nyclu.org/press-release/nyclu-on-nypd-violence-at-pro-palestine-protest-in-bay-ridge.

[16] Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

66.     However, the City of New York has admitted that many of the officers deployed to respond to protests did not even receive that training, which was supposedly required of them.

67.     As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.[17]

68.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

69.     Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

---

[17] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.

70.    Despite the wealth of evidence of NYPD members' historic brutality against protesters, Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

71.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

72.    Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian.

73.    Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity are antisemitic, and that they should prosecute them accordingly.[18]

## THE NYPD'S TRAINING TARGETS PRO PALESTINE CONTENT

74.    Upon information and belief, and under the pretextual guise of combating antisemitism, members of service receive training that is Islamophobic, antisemitic, and anti-

---

[18] Kane, *supra* n. 11.

Palestinian. The training is created by the "Combat Antisemitism Movement," an explicitly pro-Israel and anti-Palestinian organization.

76.     Indeed, current NYPD Commissioner Jessica Tisch offered opening remarks at a recent "Combat Antisemitism Movement" session.

76.     Upon information and belief, said training, which thousands of members of service have sat for, declares the following false, discriminatory, and bias statements that fuel the NYPD's violent response to protest centered around Palestine:

      a.     "Islamism is a political ideology where Islamic law overrides the Law of Man";

      b.     "Jihadism is a subset of Islam that uses violence to impose Islamic Law"

77.     Upon information and belief, the training includes a racist cartoon depicting people from the Middle East in a "Suicide Bombing Class" taking "Human-Bomb Course-Work" wherein the instructor, donning a beard and turban, is wrapped in explosives.

78.     Upon information and belief, the training characterizes students protesting in support of Palestine as "young bored and looking for purpose" thus leading them to become "extremists."

79.     Upon information and belief, the training designates student groups, such as Students for Justice in Palestine, as extremists, and insists that a call for "the liberation of Palestine from the River to the Sea" is antisemitic.

80.     Upon information and belief, while claiming to be a training on antisemitism, the training focuses solely on false, racist, bias, and discriminatory claims about Muslims, Islam, and the movement for Palestinian liberation, a movement that is diverse and fortresses support from all sectors of global society, including people of the Jewish faith.

81.     Upon information and belief, the training declares the Kuffiyeh, a traditional headdress worn by men from parts of the Middle East, as a symbol of antisemitism.

82.     However, the Kuffiyeh is a scarf with patterns representing Palestinian history and culture. The dark black strips on the edges represent the historical trade routes through Palestine. The fishnet-like pattern is a reference to Palestinians' connection to the Mediterranean Sea. Lastly, the curved lines reflect olive trees, a symbol of Palestinian heritage and a main export product of the land. The Kuffiyeh has been worn by Palestinians for generations, long before the creation of the State of Israel.

83.     Upon information and belief, the training further declares that a watermelon is a symbol of antisemitism.   In reality, Palestinians adopted the watermelon in response to Israel banning the display or possession of the Palestinian flag,  since it presented the same colors – Red, Green, White, and Black.[19]

84.     Upon information and belief, perhaps most absurdly, the training also declares that the use of "red hands"—a symbol for having blood on one's hands, or for being responsible for the murder of civilians, is antisemitic.

85.     Upon information and belief, the training also declares the following phrases to be antisemitic:

    a.   "From the River to the Sea, Palestine Will be Free;"

    b.   "There is only one solution, Intifada Revolution, Globalize the Intifada;"

    c.   "All Eyes on Rafah;" All Eyes on Rafah is a slogan that was popularized on social media in early 2024, "meant as a request for bystanders to not look away from

---

[19] Anna Furman, "How Watermelon Imagery, a symbol of solidarity with Palestinians, spread around the planet" Associated Press, Jan 18, 2024, available at https://apnews.com/article/israel-palestinians-gaza-watermelon-symbol-protests-832c9a21b82015356f0ef99d17df2633

what's happening in the city of Rafah—where as many as 1.4 million people are

sheltering after fleeing from violent fighting elsewhere in Gaza—as Israel

continues its offensive despite the large civilian population." The slogan stems

from a comment by the Director of the World Health Organization in response to

Israeli Prime Minister Benjamin Netanyahu's evacuation order for the city's

entire population.[20]

    d.  "Zionism is Racism;" and

    e.  "Settler Colonialism."

86.    Upon information and belief, members of the NYPD are directed to use the

examples of antisemitism in the training, train officers on said symbols, publicly condemn

antisemitism, and prosecute accordingly.

## FIRST CLAIM FOR RELIEF

**N.Y.C. Admin. C. §§8-801 *et seq.*, "Qualified Immunity Repeal" Claims Against**

**All Defendants**

87.    Plaintiff incorporates by reference all the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

88.    New York City Administrative Code §8-803(a) through (c) provides as follows in

relevant part:

    a.  "A covered individual who, under color of any law, ordinance, rule,

      regulation, custom or usage, subjects or causes to be subjected, including through

---

[20] Mary Whitfill Roeloffs, "'All Eyes On Rafah' Slogan Spreads On Social Media: What To Know About Its Origins" Forbes Magazine, May 28, 2024, available at https://www.forbes.com/sites/maryroeloffs/2024/05/28/all-eyes-on-rafah-slogan-spreads-on-social-media-what-to-know-about-its-origins/.

failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

b.      "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

c.      "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

89.      Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the Individual NYPD Member Defendant is considered a covered individual. §8-801.

90.      Plaintiff is a "person[s] aggrieved" because he was (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

91.      Defendant City is liable as an employer, as set out above.

92.     Defendant Delgado's use of force against Plaintiff was unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before him.

93.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

94.     Further, it is not a defense to liability under §§8-801 *et seq*. that a covered individual has qualified immunity or any other substantially equivalent immunity.

95.     Thus, the Court should award both compensatory and punitive damages against all parties (including the City), and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violations of New York State Common Law**
*Assault*

96.     Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

97.     The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

98.     Defendant Delgado committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

99.    Defendant Delgado did thereby inflict assault upon Plaintiff.

100.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## THIRD CLAIM FOR RELIEF

### Violations of New York State Common Law
### *Battery*

101.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

102.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

103.    Defendant Delgado committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

104.    Defendant Delgado did thereby inflict battery upon Plaintiff.

105.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## FOURTH CLAIM FOR RELIEF

### Violations of the New York State Constitution

106.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

107.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

108.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 3, 6, 8, 9, 11, and/or 12 of the New York State Constitution.

109.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 3, 6, 8, 9, 11, and/or 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

## FIFTH CLAIM FOR RELIEF

### Excessive Force
### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

110.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

111.    Defendant Delgado's use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted him.

112.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

113.    The illegal conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SIXTH CLAIM FOR RELIEF

**First Amendment**
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

114.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

115.    Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in subjecting Plaintiff to excessive force, in subjecting Plaintiff to Defendants' protest policing policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

116.    Defendants' retaliatory restrictions Plaintiff complains of herein imposed upon Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiff's protected conduct that:

        a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

b.      Were content-neutral but nonetheless lacked sufficiently narrow

tailoring to serve a significant governmental interest in that the restrictions

substantially burdened more protected speech and/or conduct than was necessary

to serve those interests, and/or failed to adequately provide alternatives for

Plaintiff's protected expression, including in that Plaintiff's abilities to

communicate effectively were threatened or limited; and/or

c.      Afforded Defendants unbridled or otherwise inappropriately

limited discretion to limit or deny Plaintiff's abilities to engage in protected

conduct (also raising constitutionally significant Due Process-based vagueness

and/or overbreadth concerns); and/or

d.      Amounted to the imposition of strict liability on Plaintiff for

engaging in protected speech and/or expression.

117.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of

his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and

expenses; and/or otherwise damaged and injured Plaintiff.

118.    The illegal conduct of Defendants was willful, malicious, oppressive, and/or

reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

**First Amendment Retaliation**
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the
First and Fourteenth Amendments to the United States Constitution***

119.    Plaintiff incorporates by reference all the allegations set forth in all preceding and

following paragraphs as if fully ser forth herein.

120.    Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

121.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

122.    Defendants engaged in the acts and omissions complained of herein in an effort to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

123.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

124.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

125.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

126.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

127.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise

participated in assaulting Plaintiff subjected Plaintiff to the violations of his First Amendment rights described elsewhere herein.

128.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

129.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTH CLAIM FOR RELIEF

### Municipal Liability
*Pursuant to 42 U.S.C §1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

130.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

131.    The facts as pleaded above describe the policies, practices, and customs Defendants subjected Plaintiff to, including, but not limited to uses of excessive force.

132.    All of the wrongful acts or omissions complained of herein were carried out by the individual named police officer defendant pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United

States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## JURY DEMAND

133.    Plaintiff requests a jury trial on all issues capable of being tried and determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendant and the City of New York as follows:

I.    Actual and punitive damages against the individual Defendant in an amount to be determined at trial;

II.    Actual damages in an amount to be determined at trial against the City of New York, and punitive damages pursuant to 42 U.S.C. §1988, N.Y.C. Admin. C. §8-805(1)(ii);

III.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia*, N.Y.C. Admin. L. §8-805(2), and New York common law; and

IV.    Such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful conduct.


Dated:  Ridgewood, New York
        December 23, 2025


                                        **COHEN&GREEN P.L.L.C.**



                                        By: *Leena Mohmoud Widdi*
                                        Leena Mohmoud Widdi
                                        1639 Centre Street, Suite 216

26

Ridgewood (Queens), NY 11385
t: (929) 888-9480
f: (929) 888-9457
Leena@femmelaw.com


**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com



THE ABOUSHI LAW FIRM PLLC


Tahanie A. Aboushi, Esq.
1441 Broadway, 5th Floor
New York, NY 10018
Telephone: (212) 391-8500
Tahanie@Aboushi.com

*Attorneys for Plaintiff*